Good morning, Your Honors. My name is Brent Doreian-Boyang. I represent Plaintiff Appellant Laniece Whatley-Bonner, and if I may, I'd like to reserve two minutes for rebuttal. Sure. Thank you. The District Court's findings are reviewed in novo because the instant dispute was decided on summary judgment. Could you just pull up the microphone a little closer? Sorry. You're following shorter people. All right. So hopefully you can hear me. That's better. In at least four different ways, the District Court erred in granting summary judgment in this ERISA disability case. Because the District Court admitted additional evidence, summary judgment was inappropriate. Defendants offer no contrary case law or reasoning in the briefs, and thus, at a minimum, this case should be remanded for trial. Second, contrary to the District Court's holdings, a factual dispute regarding which plan applied had to be resolved to determine the proper standard of review. Third, the District Court erred in excluding evidence on the grounds that it was not properly authenticated. And fourth, the evidence showed that the plaintiff was disabled under the definition of disability. Let's go to the fourth one. Okay. As I understand the, I wouldn't call it the administrative record, but the record before the claim to administrator, both your clients examining physician, personal treating physician, and another physician, both testified that while she had numerous problems, she was not totally disabled.  The evidence to the contrary, there isn't a dispute that she has physical work capability. No, I understand. The question here is whether she is, they both testified that she could work with accommodations in various jobs, both her personal physician and the examining physician. What was the contrary evidence? What was the evidence that she couldn't work? The contrary evidence is that based on her education, training, and experience, and the need to earn 50 percent of her pre-disability earnings, there aren't occupations that meet those standards. Where did that evidence come from? Where is that evidence before the agency? Was there an expert who said that? No. Not the agency. I'm sorry. I keep calling it the agency. Before the plaintiff. Before the administrator. Before the administrator compiled some evidence. And tell me what evidence on your side was compiled to contradict the doctor's report. So, and I don't know if you're drawing a distinction between the evidence that the district court admitted, because the district court admitted evidence regarding the three occupations that the plaintiff administrator claimed that my client could do under her restrictions and limitations. And we presented evidence that of those three occupations, which was general clerk, we presented evidence that a general clerk, which was not defined by the plaintiff administrator and did not present in the administrative record what a general clerk needed to perform. So we produced that evidence. The district court admitted it. And it shows that a general clerk requires answering the telephone, writing, keyboarding, typing, the O-Net description, which is a modern version of the DOT description. So the DOT has been deemed to be outdated by the Department of Labor. They've updated the O-Net. The O-Net description includes that this job includes the ability to transcribe dictation, answer telephones, communicate with customers, employees, and other individuals. Now, Dr. Powell, the reviewing physician for the defendant, stated that Ms. Watley Bonner was unable to perform jobs that would require extensive telephone use. She was unable to perform jobs that would require extensive communication. And so those are two of the elements to the job that the district court, not the district court, sorry, the plaintiff administrator identified. But there were three jobs that the claims administrator said your client could do. So that's one of them. The second one, similarly, was bench product assembler. I shouldn't say similarly because bench product assembler is a assembly line person. It's somebody that, at least under the definition provided by the DOT, is somebody who uses tools and machines to do things like spot welding, riveting machines, milling. They make items like speedometers, condensers, carburetors. These are things that Ms. Watley Bonner had no education, no training, and no experience, no skills in performing. So this occupation on its face is not compatible with what Ms. Watley Bonner can reasonably perform. Add to that her hearing difficulties. She's not going to be able to be trained in this occupation. Or at least she has significant hurdles to be trained. Now, your arguments now seem to assume that we do de novo review and that the district court does de novo review of the claims administrator's conclusions. And I take it that argument is linked to your argument that the old plan governs here, right? Well, we do argue, I do argue that the old plan governs. But if the new plan governs, is the claims administrator's determination reviewed for abuse of discretion? Yes. Okay. So and if we review it for abuse of discretion, if the district court reviews it for abuse of discretion, is it your position that it's nonetheless an abuse of discretion? Yes, I do. And for the reasons presented, that the claims administrator identified only three occupations. So the entire termination is predicated on identifying three occupations that can satisfy the definition of disability. The plan administrator did that by considering essentially that Ms. Watley Bonner was unable to speak on the telephone. We know she has additional restrictions, limitations. Well, we have her physician's opinion was that she could perform any job function that did not require extensive telephone use. That's what her physician said. Why couldn't the claims administrator therefore conclude that there were occupations that didn't involve, the clerk one does trouble me, but that she could perform occupations, various occupations that didn't require extensive telephone use? Dr. Tanner's, the audiologist for Ms. Watley Bonner, her restrictions and limitations were a bit more extensive. She said that not only does she have difficulty talking on telephones, but that any communication needs to take place in a quiet environment with good room acoustics. Plaintiff herself describes her inabilities in her appeal letter as saying, even though she has an implant, it helps better than can't hear anything, but can only hear in quiet room with only one person talking to me. They must speak very loudly and slowly. Most of the time I can pick up most of conversation and put together what you're saying. I can't hear people with any background noise, can't hear television, music, or talk on phone. Well, I understand it was testimony to the contrary, but my question is why was it unreasonable for the claims administrator to determine, given the treating physician's opinion and the examining physician's opinion, that she could perform these various, various occupations? Because when you actually look at what these occupations require, they do require telephone use and they do require communication in a quiet place or they do require communication that wouldn't be in a quiet place with room acoustics. I don't want to interrupt your train of thought, but could you go back and explain to me why you think the old plan applies? Is it simply because they sent her copies of the old plan at the beginning of the process? No, it's not. It's actually, we say the same thing. You don't really think it applies as a matter, put it differently, as a matter of just timing, she's under the new plan, is she not? Actually, when you look at the plan documents, it's an issue that remains in dispute. I believe both sides agree that the umbrella plan is a controlling plan document. And if you look at the express language of the umbrella plan, it says that the plan text and the text of the applicable programs legally govern the operation of the plan and program, and they are the final authority on the plan and such programs. The same plan, the umbrella plan, states that, defines that the programs will be identified in Appendix A to that same program. If you look at Appendix A, only the old plan or the CDBP is listed there. The West plan or the new plan is not listed there. So the West plan is not part of the plan. It's not a plan document. So for anybody, it's just that there's an ineffective new plan? Exactly. Is that an argument you made to the district court? It, if you look in the, not in the excerpts of record. If you look in our, I'm confused. I thought the argument you made to the district court was that because she was provided copies of the old plan and at the beginning people assumed the old plan governed that we should have the old plan govern. I don't see an argument to the district court that, in effect, the new plan was completely ineffective and didn't cover anybody. So in the issues of this. Did you make that argument? In the issues of the disputed fact, we objected to the inclusion of the West plan. And each time we objected to the inclusion of the West plan, we stated in there that the umbrella plan does not include the West plan. It only references the CDDP. Okay. So let's go back for a second, now that you've got me thoroughly confused, to the old plan. Your argument on the old plan, I take it, is that the claims administrator wasn't properly qualified and, therefore, we shouldn't grant, we shouldn't apply an abuse of discretion review? Yes. The claims administrator is not one of the entities. Doesn't, but that's my problem. When you look at 10.1, which is the definition, it doesn't purport to be an exclusive definition of entities, does it? Well, the term long-term disability claim administrator is a defined term. So when you look at the definition. And that's 10.1 where it's defined. No, it's actually defined in the definitions section. Yeah, I'm sorry. So give me the number of the definitions section. 10.1, I may be mistaken. But whatever. Go to the definitions section and tell me why that definition excludes this claims administrator. Yes. So Exert of Record 578 includes the definition of the term long-term disability claim review administrator. Right. It's defined to mean, quote, and this is paraphrasing, mutual of Omaha or other such person or person's committee or entity appointed under Section 10.1. Right. So we know it's not mutual of Omaha. So let's look to see if IDC. That's why I was referring to 10.1. Right. And so we go to 10.1, which is at Exert of Record 595. And it says that it limits who can be a long-term disability claim administrator. Tell me what it says. Quote, an insurance company, insurance service, or other similar organization which is subject to the regulation under the laws of one or more states, insurance laws of one or more states. And why is it your position that the claims administrator doesn't meet that? Sedgwick is not subject to the insurance laws of one or more states. It's not an insurance company and it's not an insurance service. Can a company that is qualified under 10.1 use somebody who's not qualified to do the administration? That I don't really know. I would think the answer is no, in that the entity that has been given discretion cannot then grant the discretion to somebody else. You can't kick it down the line if that's not authorized by the plan document. Well, let's assume for a second that we have a plan administrator, claims administrator, who doesn't meet the requirements of the documents. Why isn't that claim administrator's determination entitled to abuse of discretion review nonetheless? Is there some principle of law that says if you're not, if you don't meet the contractual requirements, therefore you're, tell me what case supports that position? Okay. So the Supreme Court's case in Firestone says that a grant, it's the defendant's burden to show that the entity that made the claims decision was vested with discretionary authority. So there needs to be a proper vesting of the discretionary authority that comes from the plan. Well, but here I don't think there's any doubt that the claims administrator was vested with discretionary authority. The question is whether the claims administrator had all the qualifications that the plan required. So tell me what case law there is to suggest that somebody with that authority doesn't get to abuse of discretion review, if you will, if they don't have all the correct qualifications. Well, I think all of the cases that deal with vesting of discretion, so. Well, let me try and rephrase this because I'm just, I'm confused. It sounds to me like you're arguing somehow that because somebody doesn't meet the qualification of being subject to an insurance licensure authority, that they, therefore all of their acts are rendered ultra viris. And what's the basis for that claim? The basis for that claim is that a delegation of authority needs to come from the plan documents. So you look to the contract to determine whether there's a valid grant of discretion. And the contract will explain to you who has discretion, if at all, and how they might come to get it. And here we look at the plan document and the CDVP, and we see that there definitely is a grant of discretion. But our argument is that it doesn't flow to the decision-making gear, to SEDGWC or IDSC. Who's the long-term disability claim review administrator? Well, under the plan's terms of the CDVP, that would need to be either mutual of Omaha or somebody that's regulated by the insurance laws. Here, the person that made the decision was definitely IDSC as administered by SEDGWC. So the long-term administrator, let's see, this 10.1 says that actually the long-term disability review claim review administrator is actually, it's defined as the person or person's committee or entity appointed pursuant to Section 11.1 of the plan, right? See, I guess I'm asking the same question. I tried to ask the same question in a different way. Isn't SEDGWC simply an agent of the long-term, of the administrator here? They're an agent of the plan administrator, but they haven't been authorized to have discretionary authority. So your position is that the administrator of the plan can say, look, there's an expert out there who evaluates claims. I'm going to employ them to evaluate the claims and, in effect, adopt their findings for purposes of this. You're saying the plan doesn't allow that? The plan does allow that, but that entity wouldn't be granted with discretion because of their ---- But it's the claims administrator that is actually exercising the discretion. Yes. But the plan needs to authorize that that claims administrator has been vested with discretion. If there isn't a proper vesting of discretion of the claims administrator, they can still make the decision. It's just that the standard review of the decision would be moved to de novo. They wouldn't have ---- And you agree that if the new plan applies, this is not a problem? Yes. That there wasn't ---- and even under your view, there was a proper vesting of discretion in the claims administrator under the new plan? Yes. Would you like to say ---- you're over your time, so would you like, you know, I'll give you another minute afterwards. You've exceeded your time. I understand. And if I can have my rebuttal time, I'd appreciate it. Yes. I'll give you a minute. Thank you. Good morning. Good morning. May it please the Court. Susan Kumagai for Appellee 18T, Umbrella Benefit Plan No. 1. The Court in Abedi determined that in order to determine the proper standard of review to apply to a case is to look to the plan words. And the plan that was in effect when Ms. Watley Bonner became disabled and took her leave was the 18T West Benefit Program and in conjunction with that, the Umbrella Benefit Plan. And if we call that ---- let's call that the new plan. Thank you. So that you don't have to use the long term each time. Respond to your opponent's argument that the new plan in effect wasn't a new plan because it didn't ----   I didn't get the number of descriptions. The 18T ---- the new plan does identify 18T West as the new program. But more importantly, the new plan in conjunction with the Umbrella plan specifically states that it incorporates all of the amendments that occurred throughout the years. The PTG, the old plan, was from 1995. And in 2001, the Umbrella plan comes into effect, and it explains to all the participants we are combining a lot of these plans together to come under one Umbrella plan. And the Umbrella plan specifically confers discretion to the plan administrator. And I don't think there's any dispute about that. But I hadn't understood until your opponent stood up that he had an argument that, in effect, the new plan on its face didn't cover his client. And you ---- what you're saying is the new plan was meant to pick up all prior plans and divide them. Absolutely, Your Honor. And I can read the plan. And we've got the plan. So if that's the case, if it's ---- if this is a new plan case, we review ---- the district court reviews for abuse of discretion. Why was this a summary judgment case in the district court? The evidence before the administrator below and the district court, even before she ---- even before the appeal or the LTD claim was denied, the claims administrator had before it not only her own physician's notes of visits where it explains her hearing is getting better, she's improving, and granted, she does say she will not be able to do the telephone operation work. Every note indicates that her condition is improving. In about March of 2010, she is asked her ---- Ms. Watley Bonner's physician is asked to fill out what's called a work capacity checklist. And in that work capacity checklist, which is in the excerpt of record 1739, she indicates that Ms. Watley Bonner can work eight hours, and she can work more than eight hours. She can work more than 40 hours a week. Then it lists 12 tasks, and it asks the physician, what tasks can your patient perform? Out of the 12 tasks, there is only one task that Ms. Watley Bonner has indicated that she cannot perform, and that is the ability to hear over the phone. Otherwise, she is capable of keyboarding, computer work, maneuvering a mouse, standing, lifting, all other 12 tasks. You know, I don't think there's any dispute that the residual work capacity through the claimant's own witnesses would indicate that there are tasks that she can perform and that she can perform them over an eight-hour workday. The issue I think that is somewhat troubling is that they identified three specific positions or occupations that she could hold, the plan administrator did, in denying the long-term disability claim. The opposition to that is, hold on, wait a minute, each of those require her to perform tasks that she cannot perform. And at that point, isn't there a question of fact, and all of a sudden we're looking at the summary judgment question a little differently? If, and I believe the court below is correct, the abuse of discretion standard is used, then in an ERISA case they're limited to the short-term, and the long-term. And so the question is, is there any record, and it's just a conduit. That's why I was asking before, was there anything in the record for the agency, again, is a loose term, anything in the record before the agency that suggested that she couldn't perform these jobs? No. And, Your Honor, the appellant argument is not complete. Yes, under the DOT terms it does say, you know, can perform certain tasks, but it says also that it can be in any combination. She doesn't have to talk on the phone to be a clerk. And in fact, her appeal letter, she even states, she went back to AT&T and she said, hey, give me an office job. I can do clerical work. Her appeal letter also says, you know, who's going to hire a completely deaf 50-year-old woman if they have to train her? First of all, she's not completely deaf, and the record is clear on that. But in addition to that, her comment clearly shows that she thinks that she can work, but she's speculating that she's not going to be hired if a prospective employer has to train her. That's complete speculation. She's not saying she can't work. In addition, Your Honor, I don't know if you would like me to go back to clarify what the actual old plan states. Well, I would, because as I read the old plan, I'm not sure there's anything wrong with using Sedgwick for whatever Sedgwick did. So would you tell me why you think that's the case? Sure, absolutely. First, the appellant concedes that the district court correctly referred to 11.4, which states that the long-term disability claim review administrator has discretion. But the appellant mistakenly then jumps to the argument that the old plan defines the claim review administrator as mutual of Omaha, but in fact, if you look on page 3 of the old plan, ER-578, it specifically states that the claim review administrator shall mean the person or person's committee or entity appointed pursuant to 11.1. You go to 11.1. That's the provision that I read. Exactly. Now, above that, it does define the claims administrator shall mean mutual of Omaha. But even at that, if you go to section 10.1, which that definition refers you to, you have to read the entire paragraph to see that you don't have to appoint an insurance entity. That paragraph states the plan administrator shall appoint a long-term disability claims administrator who shall have the responsibility to approve or deny claims for long-term disability benefits under the plan. Then it goes on to say the long-term disability claims administrator may be an insurance company. It does not say shall be. So it is definitely discretionary language used there. And the old plan, when it talks to you ñ So your position is that the word may there is simply permissive? Yes. And that it's not a requirement that the administrator meet the definitions there. Exactly, Your Honor. And, you know, the old plan, it provides for amendments and terminations if necessary. Then the SBC umbrella plan comes into effect. And that states that the plan administrator has discretion and also has authority to delegate those duties to a third party. Then you come to April of 2004, where the claims administration for the old plan is given to Sedgwick. Sedgwick has discretion. And I know that the appellant is arguing that after the denial of the LTD benefits, that she was given the old plan, but she was given the old plan along with the umbrella plan. This is not a case where it's like, aha, I got you, and really, you know, you don't fall under the old plan. She was advised all along about the umbrella plan. She was given the umbrella plan's SPD package, which explains the new claims administrator, the delegation of authority. She's given copies of the summary of material modifications in 2004. And finally, in 2009, she's given the new plan documents, and the new plan document explains that this is the plan  And she's given the new plan document along with the umbrella plan. And it specifically states that any claim filed after January 2009 falls under this new plan. And her own. There's no evidence in this record, is there, that Ms. Watley Bonner acted in detrimental reliance on the notion that she didn't do anything or fail to do something because she thought she was under the old plan? No, Your Honor, and in fact, it's undisputed that the terms under which the definition of disability, under which her claim was denied, was the same in the old plan as it was in the new plan. And in addition, in letters that is sent to her, the definition of disability under the LTD plan is spelled out for her. There was no detrimental reliance. Anything else? Not unless the Court has any further questions. Thank you. You have some time. Tell him I have some time for rebuttal. Thank you, Your Honor. I'd like to address that certainly Ms. Watley Bonner desperately wanted to go back to work. She says so in her appeal letter. She also says that she will basically do any type of work for AT&T that doesn't require using a telephone. AT&T tells her, we will not let you back in our office because you are a safety concern. Safety was never addressed in any point of the termination letter of any of the rationale for saying why she can work jobs. If AT&T, who has 260,000 employees, can't safely accommodate her, no employer can. Does she have a disability claim? What do you mean by disability? Under the ADA? That I don't know. She certainly made a disability claim to the Social Security Administration. They found her to be disabled from any occupation. If she wanted to work for an employer who refused to accommodate her, she would have a disability claim under the ADA, would she not? She might. But aren't both those things, if you look at them, how do they really make a difference in the analysis? The Social Security determination and the letter from the employer all come after the final decision on the long-term disabilities made, right? And more importantly, you can't really tell anything about the Social Security determination based on what was offered and then not received as unauthenticated, because it's the first page of the determination, looks on its face like she may have met the listed impairment, in which case there's no inquiry made as to whether or not there are significant jobs in the national economy that she could perform. And so its relevance is marginalized. Likewise, the mere fact that they say they have no jobs, it seems to be neither here nor there in the analysis as well. So, I mean, you're fighting this thing on two levels. First, you're saying is that they should have been received. And then second, given their timing and what they say, how relevant are they in the final analysis? Well, I think they were, we offered them to cure a procedural irregularity where AT&T told Ms. Watley Bonner or her husband over the phone that in appealing this, you need to provide evidence that you can't work your job. So she had already provided evidence that she was unable to work her own job. These are admittedly anecdotal evidence. They show that we know the Social Security standard isn't any occupation standard. But those rules have some meaning, in fact, they're there for a reason. That certainly needs to be something that the plan administrator needed to grapple with and say, well, here's why our determination is different. Also, the AT&T letter says not that we weren't able to find work because of various other things. It says we weren't able to find you a job because of your medical restrictions as offered by your doctor. So we know that when they do a job search, her own doctor's restrictions rendered her unable to find a job. OK. Thank you. We appreciate your arguments.
judges: Erickson, Paez, Hurwitz